TOMMIE N. RASMUSSEN AND MARY ANN RASMUSSEN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Rasmussen v. Commissioner
Docket Nos. 14548-87, 27744-87, 27736-88
United States Tax Court
T.C. Memo 1992-212; 1992 Tax Ct. Memo LEXIS 231; 63 T.C.M. (CCH) 2710; April 8, 1992, Filed *231 Decisions will be entered under Rule 155. A. Jerry Busby, for petitioners. Marikay Lee-Martinez, for respondent. DAWSON
DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: These cases were assigned to Special Trial Judge Pate pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183. [2] The Court agrees with and adopts the opinion of the Special Trial Judge which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE PATE,Special Trial Judge: In these consolidated cases respondent determined deficiencies in petitioners' Federal income taxes, additions to tax, and increased interest, as follows: TOMMIE N. RASMUSSEN AND MARY ANN RASMUSSEN 1983
1984
Deficiency
$ 6,983
$ 14,176
Additions to tax
and increased interest:
section 6653(a)(1)   349
709
section 6653(a)(2)   [1]  [1]  section 6659   2,095
4,253
section 6661   [2]  [2]  section 6621(c)   [3]  [3]  DONALD B. HORNE AND MARJORIE S. HORNE
1983
1984
Deficiency
$ 11,832.80
$ 7,787.60
Additions to tax
and increased interest:
section 6653(a)(1)   591.64
389.38
section 6653(a)(2)   [1]     [1]     section 6659   3,373.14
2,236.28
section 6661   [2]     [2]     section 6621(c)   [3]     [3]     *232 RICHARD BESSERMAN AND ROSALIE BESSERMAN 1983
1984
Deficiency
$ 12,220.00
$ 3,312.35
Additions to tax
and increased interest:
section 6651(a)(1)   496.25
section 6653(a)(1)   611.00
1,435.32
section 6653(a)(2)   [1]     [1]     section 6659   3,367.50
993.71
section 6661   [2]     --    section 6621(c)   [3]     [3]     1985
Deficiency
$ 2,630.35
Additions to tax
and increased interest:
section 6653(a)(1)   131.52
section 6653(a)(2)   [1]     section 6659   789.11
section 6661   --   section 6621(c)   [3]     *233 These cases were consolidated for purposes of trial, briefing, and opinion. They were chosen as test cases to determine the deductibility of certain losses and investment tax credits taken in connection with a series of transactions known as the Agbanc Donor Cow Program (hereinafter the Agbanc program). The issues for our decision are: (1) Whether the Agbanc program had economic substance and business purpose and, therefore, whether the losses and the investment credits attributable thereto should be recognized for Federal income tax purposes; (2) if so, the proper amount of income, deductions, and investment credit to be taken into account by each petitioner; (3) if so, whether the provisions of section 465 apply to limit the amount of loss deductible by any of the petitioners; (4) whether petitioners are subject to the various additions to tax determined by respondent; and (5) whether the Agbanc program was a tax motivated transaction within the meaning of section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the stipulated exhibits are incorporated herein by this reference. Tommie N. Rasmussen and Mary Ann *234 Rasmussen (hereinafter the Rasmussens) were residents of Arizona at the time they filed their petition in this case. Donald B. Horne and Marjorie S. Horne (hereinafter the Hornes) were residents of Texas at the time they filed their petition, and Richard Besserman and Rosalie Besserman (hereinafter the Bessermans) were residents of Arizona at the time they filed their petition. The Agbanc Program
Agbanc Ltd. (hereinafter Agbanc), is an Arizona corporation formed in 1983 to structure and manage cattle programs, acquire breeding cattle, manage farms and ranches, conduct feasibility studies, and merchandise cattle. In this regard, it conceived and promoted the Agbanc program, which stated that its objective was to breed purebred [3] Simmental cattle in order to develop genetically superior herds. Agbanc's only venture was the Agbanc program offered in 1983. *235 The Agbanc program was promoted by two corporations, Ambanc, Ltd. (hereinafter Ambanc) and Agbanc, both of which were controlled by John McDonnell. Ambanc's letterhead stated that it acted as a "sales consultant on tax oriented financing". On August 1, 1983, Ambanc entered into a contract with Agbanc, whereby Agbanc agreed to pay 35 percent of its gross income (but in no event less than $ 30,000 per month) to Ambanc for consulting services with regard to the various undertakings of Agbanc. In its Individual Animal Offering (hereinafter offering memorandum), Agbanc offered 200 purebred Simmental virgin heifer cows for sale to a maximum of 200 investors. The purchase price of each cow was $ 69,000, payable $ 6,900 down, and the balance of $ 62,100, evidenced by a nonsecured full recourse promissory note bearing interest at the rate of 9.93 percent per year, payable annually in the following principal amounts plus interest: $ 11,518 due June 30, 1984, $ 12,662 due June 30, 1985, $ 13,920 due June 30, 1986, and $ 24,000 due June 30, 1987. This payment schedule required equal annual payments of $ 17,684 for each of the first 3 years. Agbanc could not assign, sell, or otherwise dispose *236 of this note without written approval of the investor. In the offering memorandum, Agbanc stated that: The $ 69,000 purchase price has been fixed by Agbanc and is not subject to negotiations or modification, though appraisal has established the fair market price of such animals used in an embryo program to be significantly above the offering price. * * * Agbanc is of the view that the purchase price reflects each animal's fair market value.
An Appraisal prepared by Karney J. Redman (hereinafter Redman), also included therein, represented that each cow in the program was capable of producing an average of $ 65,000 of income per year form the sale of progeny and embryos and, consequently, was worth between $ 75,000 and $ 85,000. He qualified the appraisal, however, by stating that: It is our understanding that each of these cows will be used in a program to generate embryos for transplant. If for some reason a particular cow was not used in such a program, you should be aware that our appraisal would change accordingly.
The specific animals offered by Agbanc were selected by TCR based upon the "linear measurement valuation" method developed by Redman. This method *237 was developed to aid in the selection of genetically superior animals with emphasis placed on pedigree, confirmation, performance, and past performance. It uses the physical linear measurements of the animal to assess and evaluate the cow. Agbanc represented that the linear measurement valuation method provided the most effective system for selecting genetically superior animals. To each of the investors purchasing a cow, Agbanc offered a 3-year lease agreement with Therriault Creek Ranch (hereinafterTCR), a corporation running a ranch located in Eureka, Montana. TCR was family owned and, at the time of the offering, had conducted a ranching operation for several years. It started a Simmental breeding program and hired Ambanc, paying it $ 17,500, to structure the Agbanc program. TCR agreed to breed the Agbanc cows utilizing embryo transfer technology. The technology of embryo transfer is a process by which a breeder flushes embryos from a genetically superior donor cow, which then are transplanted into other lesser quality recipient cows (surrogates) who carry the calves to term. The purpose is to increase the yield of a genetically superior cow, who normally would produce *238 only nine to ten calves in her lifetime. The embryo transfer process entails the superovulation of a donor cow. To increase the number of eggs a cow normally produces, she is injected with a series of hormone shots. At her next heat, approximately 5 days later, she is bred by artificial insemination using semen from a superior bull. Six to eight days later, the fertilized eggs are flushed from her and observed under a microscope to assure normality. If a recipient cow is ready, the embryo can then be implanted in her reproductive tract and she carries the calf to term. If a recipient cow is not immediately available or is not in exactly the same estrous cycle as the donor cow, the embryo can be frozen and later thawed and transferred to a recipient cow. Under the lease, TCR agreed to place the cow in its embryo transfer program, providing the bull semen and all necessary veterinary services. It also agreed to let the cow have a naturally born calf at least once during the lease term. For each cow, it promised to pay the investor an annual rent of $ 14,070 for a period of 3 years. In addition, it agreed to pay a bonus of $ 450 per transferable embryo produced in the second *239 and third years of the lease, payable in a lump sum on July 1, 1987. Moreover, the investor was to receive the first natural born calf, if any, and six embryos guaranteed to pass a 90-day pregnancy test. The investor could elect to have the six embryos implanted in recipient cows, but was obligated to compensate TCR for this service. TCR promised to keep records relating to embryo production and provide petitioners with semi-annual reports thereof. Under the lease, the investor agreed to pay TCR $ 1,126 semi-annually for maintaining the cow during the initial year of the lease term. Afterward, if TCR's expenses of maintaining the cows increased, the investor's contribution increased proportionately. If the investor elected to have embryos implanted in recipient cows, he also had to pay $ 900 for each recipient cow. If a calf was born, the investor had to pay $ 300 semiannually for its maintenance. At the end of the lease term, TCR was to "return" the cow to the investor, and, thereafter, TCR was to have no further rights to the animal. At the end of the lease, the investor had the option to either sell the donor cow, natural calf, and the six embryos, or to retain ownership *240 of the animals and choose a cattle manager to operate his herd. The investor also had the option of extending TCR's management by executing a cattle management agreement. If the investor chose this option, he agreed to pay, every 6 months, $ 1,126 per cow and $ 300 per calf for feeding and maintenance. He also agreed to pay $ 100 per flush of the donor cow or any female cow and $ 900 each for recipient cows. Further, if TCR sold the donor cow, calves, or embryos, it was entitled to 25 percent of the sales price if the following minimum sales prices were obtained: (1) For the donor cow $ 18,000, net after deduction of selling fees; (2) for embryos $ 2,000, net after deduction of all costs associated therewith; (3) for calves (15 months or older) $ 5,250, net after deduction of cost of recipient cows and selling fees; and (4) for any natural born calf $ 6,000, net after deduction of selling fees. Agbanc was the lease service manager. In such capacity, it agreed to bill and collect lease payments and, on a best efforts basis, market and liquidate the cows and calves on behalf of the investor. In addition, Agbanc agreed to bill and collect the semi-annual maintenance payments due *241 from the investor to TCR. All of the investors and TCR were required to send their payments to Agbanc. In the offering memorandum, Agbanc represented that, over the course of the program, it would be profitable. To illustrate this premise, it provided investors with two cash flow projections. Option A assumed that: (1) The investor leases the cow for 3 years, enters into a cattle management with TCR for a fourth year, and sells the cow at the end of the 1-year management agreement; (2) a natural calf is born and sold 15 months later for $ 6,000, net of selling expenses; (3) 6 embryos are implanted in recipient cows and, when the calves are born, they are sold for $ 2,000 each, net of recipient cow expenses and selling expenses; (4) the cow is flushed for the one year covered by the cattle management agreement, and produces eight embryos which are sold for $ 500 each, net of flushing expenses and selling expenses; and (5) the cow is sold after 4 years of ownership for $ 19,500, net of selling expenses. Option B assumed that: (1) The investor leases the cow for 3 years, enters into a cattle management agreement with TCR for the next 2 years, and sells the cow at the end of the *242 2 years' management agreement; (2) a natural calf is born and sold 10 months later for $ 6,000, net of selling expenses; (3) 6 embryos are implanted in recipient cows and, when the calves are born, they are raised for 15 months and then sold for $ 5,100 each, net of recipient cow expenses and selling expenses; (4) the cow is flushed for 2 years during the cattle management agreement and produces 14 embryos which are sold for $ 500 each, net of flushing expenses and selling expenses; and (5) the cow is sold in the fifth year for $ 18,000, net of selling expenses. Using these assumptions, Agbanc projected cash flow as follows: Before Tax
Before Tax
Period
Cash Flow
Cash Flow
Ending
Option A
Option B
Dec. 83
$ (8,026)
$ (8,026)
Dec. 84
[1] (6,242)
(6,242)
Dec. 85
(242)
(692)
Dec. 86
[2] 8,133
[2] (7, 467)
Dec. 87
[3] 17,841
[3] 28,865
Dec. 88
[4] 18,374
Total cash flow   $ 11,464
$ 24,812
*243 In addition, the offering memorandum placed considerable emphasis on the tax benefits an investor could expect from the program. The principal tax benefits depicted were the investment tax credit, depreciation deductions, the deductibility of cattle maintenance expenses, and the deduction of interest expense paid pursuant to the promissory note. The following are the projected amounts: Deprec.
Interest
Operating
Year
ITC
Expense
Expense
Expense
1
$ 6,900
$ 10,350
$ 1,126
2
15,180
$ 6,167
2,627
3
14,490
5,023
3,077
4
14,490
3,765
5,852
5
14,490
2,383
2,702
6
1,126
The offering memorandum also represented that an investor would reduce his Federal income tax bill by $ 12,638 for 1983, $ 4,952 for 1984, and $ 2,835 for 1985. However, it cautioned that: This investment may be deemed a "tax shelter" by the Internal Revenue Service thereby subjecting the Purchasers to a significant risk of having their Federal income tax returns audited by that agency. Such an audit could result in assessments with regard to this investment or the Purchasers' other dealings and transactions.
Specifically, it warned the investor that the price *244 of the cow could be challenged. In this regard it stated: It is quite possible that the Internal Revenue Service will claim that the purchase price of a particular donor cow is inflated and does not actually represent the fair market value of the animal. If the Internal Revenue Service successfully makes such a claim, the anticipated tax benefits of this investment could be eliminated or drastically reduced.
Some of the cows sold to investors came from TCR's existing herd. In addition, TCR purchased some of the cows from other Simmental breeders. On November 21, 1983, TCR purchased six cows, for $ 2,500 each, from Fraser Valley Simmental Ranch (hereinafter Fraser Valley). It also purchased, from Alberta Livestock Transplants, Ltd. (hereinafter Alberta), a company located in Calgary, Alberta, Canada, two herds of cows, one of 28 animals at $ 2,500 per cow and the other of 17 animals at $ 3,000 per cow. Although the exact date of the purchases from Alberta cannot be ascertained from the record, 17 of them were shipped across the United States border on January 6, 1984. Alberta declared the value of each cow to the United States Custom Service to be $ 2,500 when they *245 entered the United States. Prior to the sale to the investor, TCR sold the cows in the program to Agbanc for $ 67,000 each, on terms which required a cash downpayment of $ 5,700 and a note for $ 61,300 carrying a 9.6 percent interest rate. The payments Agbanc was required to make under the note to TCR paralleled those of the investor's notes to Agbanc. The note was payable in principal amounts of $ 11,313 on June 30, 1984, $ 12,399 on June 30, 1985, $ 13,588 on June 30, 1986, and $ 24,000 on June 30, 1987. After adding interest, this payment schedule required equal annual payments of $ 17,197 for each of the first 3 years. The Bills of Sale evidencing TCR's sales of petitioners' cows to Agbanc were all dated June 15, 1983. The program was designed so that "money" would move in a circle. In the initial year, for each cow, the investor paid Agbanc $ 6,900, Agbanc paid TCR $ 6,700, and TCR either identified a cow in its existing herd or purchased a cow for a price ranging from $ 1,500 to $ 5,000. For each of the first 3 years of the lease, the investor owed Agbanc a $ 17,684 note payment, Agbanc owed TCR a $ 17,194 note payment, and TCR owed the investor a $ 14,070 lease payment. *246 In addition, the investor owed TCR two semi-annual maintenance payments of $ 1,126 each. All of these "payments" were charged and credited through Agbanc. Each of the investors was charged for the note payment ($ 17,684), and maintenance payments ($ 2,252), and credited with a lease payment ($ 14,070), leaving a balance due to Agbanc of $ 5,866. Agbanc owed TCR a $ 17,197 note payment and the $ 2,252 maintenance payments received from the investors and charged TCR $ 14,070 for the lease payment it had credited to the investors. Therefore, the program envisioned that upon receipt of the investors' cash payment of $ 5,866, Agbanc was to remit $ 5,379 to TCR, leaving Agbanc the balance of $ 487. Under the program, TCR never would have to actually pay anything, its lease payments to the investors being both debited and credited on the Agbanc books. Although Agbanc had not paid its notes to TCR in full, TCR suspended Agbanc's payments, and in turn, Agbanc suspended investor payments pending resolution of Agbanc's and the investor's tax problems. At the time of the suspension, petitioners were delinquent on their note payments to Agbanc, but no collection action had been initiated. *247 Agbanc sued two of its investors (other than petitioners in this action) when their payments became delinquent, but these suits were dismissed for lack of prosecution. One of these investors filed bankruptcy, but Agbanc did not submit a claim in those proceedings. Prior to the commencement of this litigation, Agbanc did not send petitioners any report of the embryos their cows had produced, or what disposition had been made of those embryos (i.e., whether they were implanted in a recipient cow, frozen, or sold). Nor did petitioners request such an accounting. Moreover, none of the petitioners attempted to sell, other than to TCR, any of their embryos or live calves. At the time of trial, TCR had not turned over possession of any cows to any investor. Petitioners
Tommie N. Rasmussen and Mary Ann Rasmussen
Petitioner, Tommie N. Rasmussen, is a criminal investigator for the Gila County Attorneys Office and, at the time of trial, had been doing this type of work for 17 years. His wife, Mary Ann Rasmussen, is a social worker for the public schools in Globe, Arizona. Prior to the end of 1983, neither of them had any experience in the cattle industry, nor had either *248 of them ever held any type of agricultural job. The Rasmussens became involved in the Agbanc program through the purchase of a general partnership interest (25 percent) in an Arizona partnership named Futura Investments (hereinafter Futura). They became interested in Agbanc when their financial advisor recommended it to them. Mr. Rasmussen knew that his financial advisor would receive a commission should they become investors. Thereafter, the program was presented to them by John McDonnell, the President and majority shareholder of Agbanc. However, Mr. Rasmussen made no independent effort to check either TCR's or Agbanc's history or reputation, or to validate any of the factual representations made in the offering memorandum. Mr. Rasmussen did submit the offering memorandum to his accountant, who also invested in the program. However, Mr. Rasmussen did not testify as to the content of any advice he received from his accountant with regard to the Agbanc Program, nor was the accountant called to testify at trial. On December 1, 1983, Futura purchased six cows from Agbanc for the total sum of $ 414,000. The Bill of Sale evidencing this purchase was dated May 11, 1984. The cows *249 Futura purchased had been acquired by TCR on November 21, 1983, from Fraser Valley at a cost of $ 2,500 each, a total of $ 15,000. Futura paid the $ 41,400 down payment on December 1, 1983, and signed a non-secured promissory note dated July 1, 1983, for $ 372,600. Futura did not submit any financial information to Agbanc at the time it purchased the cows. In 1983, Futura paid Agbanc $ 6,756 for maintenance expenses and an additional $ 5,630 for reasons unexplained in the record. Futura made no payments to Agbanc between January 1984 and February 1986. Sometime after May 30, 1986, Futura sold three live calves to TCR for $ 1,500 each, receiving credit against the note payments it owed Agbanc. Prior to the commencement of this litigation, neither Futura nor the Rasmussen's had received semi-annual reports of, nor inquired about, their cows' flushing and production records from TCR. The Rasmussens paid to or for Futura $ 14,148, $ 9,323, $ 4,109, and $ 3,868, during 1983, 1984, 1985, and 1986, respectively. They ceased making payments to Futura on July 30, 1986. Mr. Rasmussen testified that he believes he is liable for that portion of the Futura note which may remain unpaid *250 after receiving the appropriate credits. At the end of 1985, three partners withdrew from Futura. At the time of their withdrawal, all three were in default on their maintenance and note payments. Agbanc refunded to these three partners the amount of cash they had invested in the program. The Rasmussens filed joint Federal income tax returns for 1983 and 1984. On these returns, they deducted partnership losses from their 25 percent interest in Futura of $ 18,326 and $ 13,661 for 1983 and 1984, respectively. In addition, they claimed an investment credit of $ 10,350 in 1983, but because of certain limitations were able to offset only $ 2,107 and $ 2,582 in taxes for 1983 and 1984, respectively. In the notice of deficiency, respondent disallowed the claimed losses and investment credits for both years. She also determined that the Rasmussens should have reported $ 20,771 as their distributive share of income for 1984 from Futura. In addition, respondent determined that the Rasmussens were liable for additions to tax and increased interest for both years under sections 6653(a), 6659, 6661, and 6621(c). Donald B. Horne and Marjorie S. Horne
Donald B. Horne worked for *251 the United States Post Office for 44 years until his retirement in 1972. He was Director of the Engineering and Facilities Department at the Dallas, Texas, Regional United States Post Office. His wife, Marjorie S. Horne, was working in the purchasing office of the El Paso, Texas, Public School System when she resigned in 1974. Mrs. Horne was raised on a ranch and spent most of her life on a ranch. However, prior to entering into the Agbanc program, she had little experience actually operating or administering a ranch. The men in her family had taken on these responsibilities. Other than spending summers on his grandfather's ranch, Mr. Horne also had no ranching experience prior to entering the Agbanc program. However, in December 1983, Mrs. Horne's aunt died and Mr. Horne has been managing the "Home Ranch" ever since. Most of the Home Ranch has been leased out. The Hornes became interested in the Agbanc program because Marjorie Horne's son, William Max Young, was executive vice-president and 49 percent owner of Agbanc. Mr. Young has an extensive educational background in animal husbandry and works as a cattle broker and consultant. He left Agbanc's employ toward the end *252 of 1983. He did not testify at trial. On October 7, 1983, the Hornes purchased one cow in the Agbanc program. A Bill of Sale reflecting the sale of the Agbanc cow to them was dated July 1, 1983. They paid Agbanc $ 8,026, which amount included the $ 6,900 down payment and $ 1,126 in maintenance costs for 1983. They also signed a promissory note dated July 1, 1983, for $ 62,100. The Hornes testified that they believed they would have to pay the note from their personal funds if their cow did not produce sufficient income. As part of the Agbanc transaction, the Hornes submitted to agbanc a completed "Confidential Qualification Questionnaire" in which they represented the total size of their net worth and annual income. However, the questionnaire did not ask the Hornes to identify the specific assets they held or liabilities they owed which comprised their net worth, nor were they required to provide any information as to their sources of income. The Hornes paid Agbanc $ 6,994, $ 5,867, and $ 3,540, in 1984, 1985, and 1986, respectively. They ceased making payments on the note on July 1, 1986. Agbanc credited the Hornes for three lease payments from TCR. Prior to their investment *253 in Agbanc's program, the Hornes did not check into TCR's or Agbanc's history or reputation. Nor did they inspect their cow, have it appraised, or investigate to determine its fair market value. The Hornes submitted the offering memorandum to their accountant, who advised them that the program was "risky". However, they did not follow up with any type of investigation after receiving such advice. The Horne cow was a heifer raised by TCR, resulting from an embryo transplant which had been made at TCR. After producing a live calf, the Horne cow died on February 3, 1986. Despite this, TCR informed the Hornes on March 24, 1986, that their cow and her calf were "all well and healthy". It is unclear exactly when the Hornes learned that their cow had died, but Mr. Horne thought it was sometime after they filed their 1986 income tax return. In May 1986, they sold the calf back to TCR for a $ 1,200 credit on their Agbanc account. Until the commencement of this litigation, the Hornes never received any embryo production reports from TCR, nor did they inquire as to whether their cow had produced any embryos or whether they were entitled to any compensation for them. The Hornes filed *254 joint Federal income tax returns for 1983 and 1984. On Schedule E, they deducted $ 1,126 in maintenance costs and $ 9,833 in depreciation for 1983. For 1984, they reported rents received of $ 14,070, against which they deducted interest of $ 6,167, maintenance costs of $ 3,378 and depreciation of $ 14,421, thereby claiming a net loss of $ 9,896. The Hornes claimed the investment credit of $ 6,900. They did not claim a loss on their cow when it died in 1986. In the notice of deficiency, respondent disallowed all of the deductions claimed by the Hornes (except for $ 1,126 of maintenance expense in 1984), but did not adjust for the rental income they had reported. In addition, respondent determined that the Hornes were liable for the additions to tax and increased interest under sections 6653(a), 6659, 6661, and 6621(c) for both years. Richard Besserman and Rosalie Besserman
Richard Besserman is a medical doctor specializing in diseases of the ear, nose, and throat. He has practiced medicine in the Phoenix, Arizona, area for 21 years. Rosalie Besserman is an interior designer. Neither of the Bessermans had any involvement with the cattle industry prior to investing in *255 Agbanc. The Bessermans were personal friends of and had prior business dealings with John McDonnell. However, the Agbanc program was sold to Mr. Besserman by a patient who had a financial planning practice. Mr. Besserman purchased one cow for $ 69,000 on December 21, 1983. The Bill of Sale evidencing this transaction was dated April 19, 1984. He signed an Installment Purchase agreement effective July 1, 1983 (which had attached Exhibit A identifying the cow purchased), and a promissory note dated July 1, 1983, for $ 62,100. Mr. Besserman testified that upon signing the note he felt obligated to pay the note. He paid Agbanc $ 4,742 and $ 5,867, in 1984 and 1985, respectively, but made no payments thereafter. There is no evidence that the Bessermans independently checked TCR's or Agbanc's history or reputation prior to investing in the program. Mr. Besserman submitted the "Confidential Qualification Questionnaire" to Agbanc making representations as to the amounts of his net worth and annual income, without specifying the sources of this wealth or income. The Besserman cow was purchased by TCR from Alberta as evidenced by an invoice dated January 6, 1984, for $ 2,500. When *256 the cow entered the United States on that date, Alberta declared its value to be $ 2,500. Prior to his purchase, Mr. Besserman did not know the identity of his cow, nor did he have it inspected or appraised. Mr. Besserman never received reports from TCR nor inquired about the embryo production of his cow prior to the commencement of this litigation. The Bessermans filed joint Federal income tax returns in 1983, 1984, and 1985. Although their 1985 return was not filed until October 17, 1985, the Bessermans gave no reason for the delay. On these returns, they reported their Agbanc activity on Schedule F. For 1983, they deducted $ 2,252 in feed purchased and $ 9,832 in depreciation, for a total loss of $ 12,084. For 1984, they reported $ 14,070 as other income, and deducted $ 6,167 in interest, $ 1,126 in feed purchased, $ 14,421 in depreciation, and $ 150 in dues and publications, for a net loss of $ 7,794. For 1985, they reported $ 14,070 as sale of livestock-other income, against which they deducted $ 13,766 in depreciation, $ 1,126 for feed purchased, and $ 5,023 in interest, for a net loss of $ 5,845. In addition, for 1983, the Bessermans claimed and were able to use the *257 entire $ 6,900 investment tax credit attributable to their Agbanc investment. In the notice of deficiency, respondent disallowed the losses and the investment credit claimed. Respondent also determined that the Bessermans were liable for additions to tax and increased interest under section 6661 for 1983 (to the extent section 6659 does not apply), under section 6651(a)(1) for 1984, and under sections 6653(a), 6659, and 6621(c) respectively for all 3 years. Experts
Timothy J. Gay
Petitioners presented the expert testimony of Timothy J. Gay to support their contention that the fair market value of the program was $ 69,000. Mr. Gay is a certified public accountant, and in his capacity as an auditor, he has audited some agricultural entities. However, he is not an expert at valuing cattle. At the time of trial, he was in charge of securities, litigation support, and bankruptcy services, at Toback & Company, CPA's. To value the program, Mr. Gay relied on the offering memorandum and periodicals published in 1983. He never saw the cows but claimed it was unnecessary to do so because his valuation of the program was based on economic return using projected cash flow as *258 it had been included in the offering memorandum, except that, in his projection, he increased embryo sales. He did not investigate the validity of any of the projections included in the offering memorandum because it was his understanding that the projections pertaining to the ability of the cows to produce the income were based on the opinion of experts in Simmental cows. He determined that, in 1983, the value of each cow in the program was $ 73,427. C. K. Allen
Respondent's first expert, C. K. Allen, is an associate professor of agriculture at Northwest Missouri State University with a B.S., M.S., and Ph.D., in animal husbandry. Since receiving his doctorate, he has worked primarily in the animal breeding and genetics field. Dr. Allen also has experience in cattle valuation and cattle management. To prepare his report, Dr. Allen inspected petitioners' seven cows. The Horne cow had died. He researched the value of Simmental cattle during the years in issue, looking at the distribution of values as well as the averages. He factored in individual merit, reviewing the cows' weaning weights and pedigree. Dr. Allen concluded that the Agbanc cows were average or a little *259 better than average. He found that in 1983, an average full-blood Simmental heifer was worth $ 3,173. He valued the Futura cows from $ 3,400 to $ 4,500, the Horne cow at $ 2,000 to $ 7,000, and the Besserman cow at $ 2,500. It was Dr. Allen's opinion that putting cows into the Agbanc program or any other embryo transplant program did not increase their fair market value. He also stated that leasing cows is not common in the cattle industry and that the "stream of income" approach is not used in the industry to appraise cows. Moreover, because embryo transplant programs generally are so expensive, only superior cows are placed in such programs, and the Agbanc cows did not measure up to that quality standard. While at TCR, Dr. Allen observed that the Agbanc cows were being treated like commercial cattle, not as highly valuable breeding cattle. He stated that "a two or three thousand dollar calf is an expensive calf, * * *,and they just weren't being handled that way. They were being handled en masse". Ron Daily
Respondent's second expert, Ron Daily, received his B.S. Degree in Animal Science in 1970. He has 15 years' experience in managing cattle operations, 5 years *260 conducting agricultural appraisals and 2 years as Executive Secretary of the Texas Angus Association. He is a member of several professional associations, including the International Society of Livestock Appraisers and the American Society of Farm Managers and Rural Appraisers. His appraisal was based on a comparable market analysis, viz a comparison of the subject property with other livestock that have been sold in approximately the same period. He compared cattle of like pedigree, quality of individuals, size, and age. He used sales averages for Simmental cattle during similar time spans. From these factors, he calculated a composite figure to arrive at the fair market value of petitioners' cows. Based upon his investigation and analysis, he found that the average fair market value of petitioners' cows, as of July 1, 1983, was $ 2,719. Mr. Daily noted that the Agbanc program provided that the cows sold to petitioners would be virgin heifers, and that virgin heifers have no production history from which to indicate their ability to produce quality calves. Although sales data sometimes show that the value of a cow increases when it has proven its ability to produce superior *261 progeny, this added value is not the result of the increased number of progeny, but rather the quality of the progeny. He concluded that the cost associated with embryo transfers was too high to risk on cows of unknown production. He faulted the cash flows projected under options A and B in the offering memorandum because, among other things, they were based upon each of the cows producing 53 embryos during 2 years of flushing. He felt that 26 embryos per donor per year is extremely high; his involvement with approximately 25 Simmental donors showed that they averaged eight viable transferable embryos per year. The data from other embryo transfer centers also indicate that the number of embryos projected by Agbanc was more than double the industry average. Moreover, by examining TCR's records, he determined that the average success rate for implanted embryos for Agbanc cows was 33 percent. Based on these determinations, he valued the Agbanc embryos at $ 250 to $ 300. Finally, Mr. Daily commented that the sale/leaseback approach customarily is used in appraising real estate and that "no one has ever been able to conduct an income approach appraisal on beef cattle due to the *262 inconsistent production of the animals and the wide range of operation costs associated with the production of progeny". Richard W. Parks
Respondent's final expert, Richard W. Parks, received his A.B. from Harvard, and his M.A. in Statistics and Ph.D. in Economics from the University of California, Berkeley. An economist, he analyzed the economic feasibility of the Agbanc program. In discussing the fair market value of the Agbanc cows, Dr. Parks focused on the prices at which they sold: first from Alberta Livestock and Fraser Valley Simmental Ranch to TCR ($ 2,500 - $ 4,000), then from TCR to Agbanc ($ 67,000), and finally from Agbanc to the investors ($ 69,000). He found no indication in the Allen, Daily, or Redman reports, of prices for comparable livestock in the $ 60,000 range; he did find considerable market evidence supporting prices of $ 3,000 to $ 4,000. Consequently, he concluded that neither the TCR to Agbanc sale at $ 67,000 nor the Agbanc to investor sale at $ 69,000 could be regarded as being at a fair market value. Rather, their purpose was to establish an inflated value because it served as the basis on which an investment tax credit and depreciation *263 deductions were computed for the investors. Dr. Parks criticized the Redman appraisal of $ 75,000 to $ 85,000 included in the offering memorandum. In it, Redman suggests that the cows selected for the Agbanc program were more valuable than other identical cows not used in the program, and attributed value to the Agbanc cows based on the projected cash flows of the program, ignoring the fact that the cows could be replaced for $ 3,000 to $ 4,000. In Dr. Park's opinion, Redman used an incorrect economic analysis because in competitive markets the price of reproducible goods tends toward the cost of reproducing an equivalent or substitute good. The reason for this tendency is that, if the price is above reproduction cost, competitors will enter the market, produce the good and offer to sell it at a lower price. This process will continue until the market value closely approximates the reproduction cost. Dr. Parks illustrated this principle by comparing two identical cars, each priced at $ 10,000. Despite the fact that the first car may be used as a family car producing no income and the second may be used as a taxicab, generating net income of $ 20,000 per year, the second car *264 continues to be worth the same amount as the first. In those cases where the ability to generate income may depend on ownership of a license or medallion, allowing access to a limited market, the resale price might well exceed the $ 10,000 value of the car itself, but the extra value is attributable to the license, not the car. Dr. Parks also noted that one important premise of the concept of a fair market value is that the buyer and seller be "informed". If petitioners had been informed buyers, they would have known that the market price of cows comparable to the Agbanc cows was less than $ 4,000, and, therefore, would have refused to pay more for just the cow alone. Similarly, he found it made no economic sense for TCR to make lease payments whose present value vastly exceeded the prices at which it could (and did) purchase comparable animals. Finally, Dr. Parks pointed out that, in the cash flow projections, most of the cash projected to be received early in the program was covered by the contractual obligations built into the Agbanc program, whereas the larger amounts toward the end of the period were associated with sales prices and bonus payments, items involving substantial *265 risk. OPINION The issue we must first decide is whether the Agbanc program had economic substance and business purpose and, therefore, whether the losses and investment credits attributable thereto should be recognized. It is a long-settled rule of law that transactions which have no business purpose or economic substance other than the creation of income tax losses or credits are to be disregarded for tax purposes. Knetsch v. United States, 364 U.S. 361, 366 (1960); Gregory v. Helvering, 293 U.S. 465, 469-470 (1935); Killingsworth v. Commissioner, 864 F.2d 1214, 1216 (5th Cir. 1989), affg. Glass v. Commissioner, 87 T.C. 1087 (1986); Boynton v. Commissioner, 649 F.2d 1168, 1172 (5th Cir. 1981), affg. 72 T.C. 1147 (1979). To determine whether economic substance is present, courts analyze the objective realities of the transaction to determine whether what was actually done is what the parties to the transaction purported to do. Gregory v. Helvering, supra at 469; Killingsworth v. Commissioner, 864 F.2d at 1216. Therefore, *266 when taxpayers resort to the expedient of drawing up documents to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits, the particular form they employed is disregarded for tax purposes. Frank Lyon Co. v. United States, 435 U.S. 561, 572 (1978); Falsetti v. Commissioner, 85 T.C. 332, 347 (1985). In evaluating the economic reality of a particular transaction, courts typically focus on whether (1) the transaction had "economic substance", and (2) the taxpayer had a nontax business purpose beyond the generation of tax benefits. Sochin v. Commissioner, 843 F.2d 351, 353 (9th Cir. 1988), affg. Brown v. Commissioner, 85 T.C. 968 (1985); Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d 1543, 1549 (9th Cir. 1987), affg. T.C. Memo. 1986-23. These elements are precise factors to consider in analyzing whether the transaction had any practical economic effects other than the creation of income tax losses. See, e.g., Neely v. United States, 775 F.2d 1092, 1094 (9th Cir. 1985); *267 Thompson v. Commissioner, 631 F.2d 642, 646 (9th Cir. 1980), affg. 66 T.C. 1024 (1976). In this case, we are faced with deciding whether, and to what extent, petitioners are entitled to deductions and credits with regard to their Agbanc transactions. Respondent argues that these transactions should be disregarded for Federal income tax purposes and that petitioners should not be allowed to deduct any losses or be allowed any investment credit because their transactions with Agbanc lack economic substance. Moreover, she maintains that Agbanc is a generic tax shelter and should be analyzed in accordance with Rose v. Commissioner, 88 T.C. 386, 414 (1987), affd. 868 F.2d 851 (6th Cir. 1989). Petitioners claim that the Agbanc program, as formulated and set forth in the offering memorandum, was bona fide and, therefore, they are entitled to the tax benefits flowing therefrom. For petitioners to prevail, we would have to find that the elements of that transaction had "economic substance" and "business purpose". In other words, to allow petitioners the full amount of the losses and investment credits they claimed, *268 we would have to find that: (1) The sales between Agbanc and petitioners and the leases between TCR and petitioners were bona fide transactions; (2) petitioners' promissory notes to Agbanc evidenced genuine indebtedness; and (3) petitioners intended to profit from their investment in the Agbanc program. Validity of Sale and Lease Transactions
Clearly the most important factor we must consider in determining whether the Agbanc cattle sales were bona fide transactions is the relationship of the price charged petitioners for the cows and their fair market value. See, e.g., Independent Electric Supply, Inc. v. Commissioner, 781 F.2d 724, 728 (9th Cir. 1986), affg. Lahr v. Commissioner, T.C. Memo. 1984-472; Marine v. Commissioner, 92 T.C. 958, 989 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991); Brannen v. Commissioner, 78 T.C. 471, 508 (1982), affd. 722 F.2d 695 (11th Cir. 1984). Since a normal attribute of a true arm's-length sale is a purchase price approximately equal to fair market value, a big difference between the two amounts strongly indicates *269 that the transaction lacks economic substance. Falsetti v. Commissioner, supra at 351; Thompson v. Commissioner, 66 T.C. at 1051-1053. "Fair market value" has been defined as the price upon which a well informed and willing buyer and seller would agree, dealing at arm's length, with neither acting under any compulsion to buy or sell. Drybrough v. Commissioner, 45 T.C. 424, 429 (1966), affd. per curiam 384 F.2d 715 (6th Cir. 1967). The determination of fair market value is a question of fact to be determined from all of the evidence. However, where the property to be valued has been sold in an arm's-length transaction, at or about the valuation date, the most reliable evidence of the fair market value of such property is its sales price. Andrews v. Commissioner, 38 F.2d 55, 56-57 (2d Cir. 1930), affg. 13 B.T.A. 651 (1928); Chiu v. Commissioner, 84 T.C. 722, 730 (1985); Flynn v. Commissioner, 35 B.T.A. 1064 (1937). Except for the cow sold to the Hornes (which was born and raised on TCR's ranch), TCR purchased all of the cows *270 sold to petitioners from Alberta and Fraser Valley for $ 2,500 per cow near the time petitioners acquired their cows from Agbanc. These cows were then sold to Agbanc for $ 67,000 each and Agbanc resold them to petitioners for $ 69,000 each. Because the sales between Agbanc and TCR were part of a prearranged program, the parties to that sale were not dealing at arm's length, and, therefore, we may properly ignore such sales for valuation purposes. On the other hand, the transactions between TCR and Alberta and Fraser Valley were at arm's length. Therefore, we view the price Alberta and Fraser Valley charged TCR ($ 2,500 - $ 3,000) as the best evidence of the amount at which these cows would change hands between a willing buyer and seller in an arm's-length transaction. Cf. Guggenheim v. Rasquin, 312 U.S. 254, 257-258 (1941). See Colonial Fabrics, Inc. v. Commissioner, 202 F.2d 105, 107 (2d Cir. 1953), affg. a Memorandum Opinion of this Court dated January 22, 1951; Brannen v. Commissioner, 78 T.C. at 497; Narver v. Commissioner, 75 T.C. 53, 96-97 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982). *271 Petitioners argue, however, that in determining whether the sales to petitioners were bona fide transactions, we must value not only the cow, but also determine the value of the "Agbanc program", viz, place a value on those intangible rights added to the cow when it was placed in the Agbanc program. Petitioners identify such intangibles as the value of the lease, the expertise of TCR in the embryo transfer process, the expertise of TCR and Agbanc in marketing cattle, and the economies of scale anticipated from participation in TCR's large scale operations. However, the offering memorandum represented that "Agbanc believes that the $ 69,000 purchase price represents the fair market value of each donor cow". (Emphasis added.) It further represented that the investor would be entitled to an investment credit and depreciation deduction based on that $ 69,000 purchase price. Because investment tax credits are available only on the cost of tangible property (sections 38(a)(2), 46(a) and (c), 48(a)), [4] and depreciation must be based on the cost of tangible property (section 168(a) and (c)), [5] we conclude that, at least for purposes of computing those tax deductions and credits, *272 the offering memorandum must have been referring to the fair market value of the "cow" and not the "program". Moreover, petitioners' argument was propounded by taxpayers in two other cases involving the purported sale of cattle already decided by this Court. Houchins v. Commissioner, 79 T.C. 570 (1982); Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221 (1981). *273 In both Houchins and Grodt & McKay Realty, Inc., the taxpayers argued that the value of their investment included certain contract rights associated with the cattle. In these cases, we found the applicable contract rights were valueless. See also Autrey v. United States, 889 F.2d 973 (11th Cir. 1989). However, petitioners argue that the contract rights attached to the cows in the Agbanc program did have value. This value rested primarily in the lease, for it purported to provide an income stream of $ 14,070 per year for 3 years. In fact, petitioners' only expert witness valued the program based on the cash flow projected in the offering memorandum (after increasing the projected amount of embryo sales), which included the annual rents to be realized from the lease. To make such a finding, however, we would have to find that a corporation (TCR), experienced in ranching and in breeding cattle, was willing, in an arm's-length transaction, to pay $ 14,070 per year to rent a cow that it could purchase for $ 2,500. Our common sense rules otherwise. Only when we consider the Agbanc program as a whole does it become apparent why TCR would enter into such *274 a lease agreement. TCR was willing to lease a cow for that exorbitant amount of annual rental only because it would never be required to come up with any money to pay such rental; the Agbanc program envisioned that the lease "payments" would be made by bookkeeping entries. Under these circumstances, we find that the leases between TCR and petitioners simply had no economic substance, and, accordingly, we disregard it in our analysis. Petitioners also ask us to value other intangible rights they acquired under the Agbanc program, such as the management and marketing expertise of both TCR and Agbanc. Even if such expertise could be separately evaluated, petitioners did not present any evidence of such value. Moreover, even if they could and had done so, because of the inflated price paid by petitioners for their cows, the economic benefits flowing from the use of such expertise would accrue to TCR; it would not have benefited petitioners. Lastly, petitioners ask us to value their right to board their cattle at TCR, a large ranching operation. However, petitioners had to pay $ 1,126 semi-annually for this right during the initial year. During subsequent years, this semi-annual *275 payment was to increase proportionately with TCR's costs. There is no suggestion in the record that this maintenance payment would not cover the value of the right to use TCR's facilities. Accordingly, we find that intangible right also had no value. Our finding that the prices charged TCR by Alberta and Fraser Valley for the cows is the best indication of the fair market value of the cows sold to petitioners by Agbanc is buttressed by the opinions of Dr. Allen and Dr. Parks, respondent's experts. They both were of the opinion that putting the cows into the Agbanc Donor Cow Program or any other embryo transplant program would not have made the cows any more valuable than cows of the same quality not in a transplant program. Moreover, the fair market values of the cows determined by these experts all were within the same "ballpark". Petitioners' expert testified to the value of the Agbanc program; he presented no evidence as to the value of the cows. He valued the program based entirely on the facts and figures portrayed in the offering memorandum, except that he increased embryo sales. He admitted that he is not an expert in the valuation of cattle, and that he did not investigate *276 the validity of any of the amounts in the offering memorandum. Without a valid independent investigation of the cash flow projections on which his opinion was based, we give little credence to his valuation. Finally, petitioners claim that the cows chosen were superior breeding animals because they were chosen by using Redman's "linear measurement system". However, because the Agbanc cows were chosen from Alberta and Fraser Valley using such system, any advantage the system may have produced was already reflected in the cost of the cows to TCR. In addition to the wide discrepancy between the fair market value of the cows and the price to the investor in the offering memorandum, there are a number of other factors which also indicate that there was no economic substance to these sales. In Houchins v. Commissioner, supra at 591, and Grodt & McKay Realty, Inc. v. Commissioner, supra at 1237-1238, we identified six factors to be considered in deciding whether a sale was bona fide. See also Cherin v. Commissioner, 89 T.C. 986, 997 (1987); Massengill v. Commissioner, T.C. Memo. 1988-427, affd. *277 876 F.2d 616 (8th Cir. 1989). They are: (1) Whether legal title passes; (2) the manner in which the parties treat the transaction; (3) whether the purchaser acquired any equity in the property; (4) whether the purchaser has any control over the property, and if so, the extent of such control; (5) whether the purchaser bears the risk of loss or damage to the property; and (6) whether the purchaser will receive any benefits from the operation or disposition of the property. The following application of these factors to the Agbanc program also shows the Agbanc sales to be spurious. Petitioners produced bills of sale dated June 15, 1983, evidencing TCR's sale of the cattle to Agbanc, and bills of sale dated July 1, 1983, April 19, 1984, and May 11, 1984, reselling the cattle from Agbanc to petitioners, to establish that petitioners received legal title to the cattle. However, except for the Horne cow, TCR did not own the cows on June 15, 1983, the date it purportedly sold them to Agbanc. Moreover, it is unclear on what date TCR actually identified the individual cows to the contracts, and, in any event, it appears that this was done after the end of 1983. Therefore, *278 we doubt the efficacy of those documents to transfer title to petitioners in 1983. Further, there is considerable evidence that the parties did not treat the transaction as a sale. At the time Agbanc and petitioners documented the transaction, none of the cows had been assigned. Possession of the cows was never transferred to petitioners but remained throughout with TCR and, at all times, TCR treated the cattle as its own. Moreover, although under the lease petitioners purportedly retained an economic interest in the cows' production, TCR neglected to report to petitioners the number of embryos being produced by each cow, and whether TCR was transferring them to recipient cows, freezing them, or selling them. All of these factors show that neither petitioners nor TCR acted as though a sale had been consummated. In addition, as is evident from our discussion of the fair market value of these cows, petitioners never acquired any equity in the cows. The balance on the promissory notes always exceeded such value. The fourth factor is whether petitioners had any control over the property. The documents show that petitioners had complete control and that they had an option as to *279 whether they would lease the cow to TCR. However, as a practical matter, no one would enter into the Agbanc program to purchase a cow worth $ 2,500 for $ 69,000, without entering into such lease, as the lease was that part of the transaction which enabled petitioners to "pay" such a high price without having to come up with actual cash. Because the lease was necessary for the transaction to "work", petitioners never had any real choice, and, therefore, TCR always retained control over the possession and management of the cows. With regard to which party bore the risk of loss, the documents indicated that petitioners did. However, again, as a practical matter, TCR bore such risk. This conclusion is poignantly illustrated by the death of the Horne cow. Even though the Horne cow died in February 1986, the Hornes continued to get credit for the annual lease payments. Moreover, neither Agbanc nor TCR demanded payment of its notes from the Hornes, even though there were no future revenues to be derived from the Horne cow. Lastly, we must consider whether petitioners were likely to receive any benefits from the production from or disposition of their cows. Based on our economic *280 analysis included later in this opinion, we find that they would not. In summary, petitioners would have us find that a bona fide sale occurred when a cow TCR originally purchased for $ 2,500 was, within a short time, sold to petitioners for $ 69,000. In addition, they would have us accept as bona fide a lease in which TCR, an experienced ranching operation, promised to pay a $ 14,070 annual rental on a cow it could purchase for $ 2,500. We reject both premises based on the preceding analysis and find that neither the sale of the cattle to petitioners nor their leases with TCR had any economic substance. Structure of Financing
The presence of deferred debt that is not likely to be paid is an indication of lack of economic substance. Knetsch v. United States, 364 U.S. 361 (1960); Waddell v. Commissioner, 86 T.C. 848, 902 (1986), affd. per curiam 841 F.2d 264 (9th Cir. 1988); Estate of Baron v. Commissioner, 83 T.C. 542, 552-553 (1984), affd. 798 F.2d 65 (2d Cir. 1986). Therefore, where a transaction is not conducted at arm's length by two economically self-interested parties, or *281 where a transaction is based upon "peculiar circumstances" which influence a purchaser to agree to a price in excess of the property's fair market value, we have disregarded indebtedness to the extent it exceeded the fair market value of the purchased asset. See, e.g., Bryant v. Commissioner, 790 F.2d 1463, 1466 (9th Cir. 1986), affg. Webber v. Commissioner, T.C. Memo. 1983-633; Odend'hal v. Commissioner, 80 T.C. 588, 604 (1983), affd. and remanded 748 F.2d 908 (4th Cir. 1984); Lemmen v. Commissioner, 77 T.C. 1326, 1348 (1981); Roe v. Commissioner, T.C. Memo. 1986-510, affd. without published opinion Young v. Commissioner, 855 F.2d 855 (8th Cir. 1988), affd. without published opinion Sincleair v. Commissioner, 841 F.2d 394 (5th Cir. 1988). We have found that the Agbanc cows were worth considerably less than their sales price to petitioners, and that the annual rent called for in TCR's lease of those cows greatly exceeded any rental which could be considered economically feasible. These inflated amounts were reflected in promissory *282 notes in the amount of $ 62,100 per cow. By arranging that the price of the cows be inflated, and then deferring payment of the inflated portion by these notes, Agbanc greatly increased the investment tax credits and depreciation deductions available to petitioners without requiring payment in cash. The offering memorandum represented that these notes would be "paid" by offsetting lease payments, sales of calves, bonus payments for embryos and, lastly, the sale of the cow. Therefore, petitioners knew that, at least for the first 3 years, the principal payments due to TCR on these "recourse" notes would be offset by the lease payments they were owed by TCR. As expected, bookkeeping entries were made on the Agbanc books crediting petitioners for the lease payments and debiting petitioners for the note payments. We considered a similar situation in Estate of Franklin v. Commissioner, 64 T.C. 752 (1975), affd. 544 F.2d 1045 (9th Cir. 1976). Under the form of that transaction, a motel was sold to the taxpayer and his partners at an inflated price with the seller financing the transaction. The seller then leased back the motel, such lease calling *283 for rental payments approximating the payments due on the purchase price. Bookkeeping entries reflecting payments due under the sales agreement by the buyer to the seller were offset against rentals due under a lease from the seller to the buyer. We declined to award any economic significance to those bookkeeping entries because -- The obligations * * * are too contingent and indefinite to constitute indebtedness within the meaning of section 163(a) or cost for the purpose of computing a basis for depreciation under section 167(g). * * *
Estate of Franklin v. Commissioner, 64 T.C. at 771; see also Hager v. Commissioner, 76 T.C. 759, 787-788 (1981). Nevertheless, petitioners argue that we should recognize their indebtedness to Agbanc because their notes were "recourse", and petitioners testified that they believed that they would have to pay these notes with other resources had the annual rent under the lease, and sales of calves, embryos, and their cow, not covered the payments. However, we must examine the substance of such debt and not be guided solely by its form. Waddell v. Commissioner, 86 T.C. at 902. *284 We have refused to give effect to notes, which appear on their face to be recourse notes, but which were unlikely to ever be enforced because of the circumstances surrounding them. See, e.g., Patin v. Commissioner, 88 T.C. 1086, 1122-1124 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. . Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989); Helba v. Commissioner, 87 T.C. 983, 1009-1011 (1986), affd. without published opinion 860 F.2d 1075 (3d Cir. 1988); Houchins v. Commissioner, 79 T.C. 570, 599-603 (1982). From the outset, neither Agbanc nor petitioners treated their indebtedness as genuine. For instance, one of the first indications that a loan is genuine is the care with which a perspective lender scrutinizes a transaction prior to making the loan to ensure that it will be repaid. Had a third party lender, such as a bank, been *285 making unsecured loans as substantial as those purportedly made by Agbanc, it would have required extensive financial information from the borrower, and then the information supplied would have been checked. Yet, the Confidential Qualification Questionnaire included in the offering memorandum only required information as to the total net worth and total income of the investor without revealing its makeup or source. Moreover, although Agbanc received a completed Confidential Qualification Questionnaire from both the Hornes and Bessermans, it did not make any investigation to determine the validity of that information. Agbanc did not even require the completion of a Confidential Qualification Questionnaire from Futura or any of its partners. Certainly, a bona fide lender would have required financial information from Futura about its organization and financial condition (as well as the financial condition of its partners) before advancing $ 372,600 to purchase six cows. Agbanc's failure to take these steps indicates that it had no intention of enforcing collection of these notes. Nevertheless, Agbanc points to the fact that it sued two of its investors (other than petitioners) *286 to prove that it intended that the notes be paid. However, both of these lawsuits were dismissed for failure to prosecute these actions. Moreover, there is no evidence that these notes were paid either before or after the dismissals. Finally, although the notes to Agbanc were "recourse", Agbanc notified petitioners in 1987 that it had suspended payments thereon. John McDonnell testified that he did this because the Internal Revenue Service had disallowed the promised tax benefits to petitioners, thereby putting them in a cash bind. However, the offering memorandum had warned the investors that the projected tax benefits might not stand up under scrutiny. Therefore, the Internal Revenue Service's disallowance was anticipated by the parties prior to petitioners' incurring this indebtedness, yet no provision was inserted in the notes to provide for this contingency. In form, these notes were enforceable regardless of circumstances, and had they been genuine, a lender would have so enforced them. In summary, these Agbanc transactions involved parties which did not deal at arm's length. Petitioners purchased cows at greatly inflated prices. For each cow, they paid $ 6,900 in *287 cash, which cash payment exceeded the fair market value of the asset purchased. In addition, they signed nonsecured "recourse" promissory notes which further inflated the purchase price of their cows, thereby increasing petitioners' investment credits and depreciation. Payments on the notes were made by bookkeeping entries which were offset by highly inflated lease payments. When payments became delinquent, Agbanc made only cursory collection efforts and later suspended payments, even though it purportedly had an enforceable right to collect. Under these circumstances, we conclude that this "indebtedness" was not genuine; it did nothing more than create income tax benefits. Accordingly, it cannot be recognized. See Goldstein v. Commissioner, 364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965). Business Purpose
In order for us to uphold the losses and credits they claimed, petitioners must also show that they had a business purpose other than tax avoidance when entering the Agbanc program. Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990), affg. in part and revg. in part Larsen v. Commissioner, 89 T.C. 1229 (1987); *288 affg. T. C. Memo. 1987-628, affg. Moore v. Commissioner, T.C. Memo. 1987-626, affg. Stern v. Commissioner, T.C. Memo. 1987-625. This "business purpose" test involves consideration of whether petitioners had an "actual and honest profit objective". Shriver v. Commissioner, 899 F.2d 724, 725-726 (8th Cir. 1990), affg. T.C. Memo. 1987-627; Estate of Thomas v. Commissioner, 84 T.C. 412, 439-440 (1985). In determining whether a taxpayer intended to profit from an activity in which his participation was passive, we must pay particular attention to whether the taxpayer was prudent in acquiring the property and in assigning duties to third parties and to whether the taxpayer monitored the performance of such duties as the enterprise progressed. Flowers v. Commissioner, 80 T.C. 914, 932 (1983). Specifically, this Court has taken into account (in addition to the factors already discussed in this opinion), such factors as: Whether the taxpayer was knowledgeable of the industry, Sutton v. Commissioner, 84 T.C. 210, 224 (1985), affd. per curiam *289 788 F.2d 695 (11th Cir. 1986), affd. sub nom. Knowlton v. Commissioner, 791 F.2d 1506 (11th Cir. 1986); whether he attempted to obtain valid information about the industry or research the feasibility of making a profit in a particular industry, Surloff v. Commissioner, 81 T.C. 210, 234-237 (1983); whether he ultimately relied upon the promoters of the shelter, Estate of Baron v. Commissioner, 83 T.C. 542, 555-556 (1984), affd. 798 F.2d 65 (2d Cir. 1986); whether he negotiated the purchase price, Elliott v. Commissioner, 84 T.C. 227, 238 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986); whether there was any evidence of past profitability, Cronin v. Commissioner, T.C. Memo. 1985-83; and whether he spent any appreciable time or effort in monitoring his investment, Horn v. Commissioner, 90 T.C. 908, 936 (1988). Application of these factors to the Agbanc program shows that petitioners did not enter into or engage in the Agbanc transactions with economic profits in mind. For instance, none of the petitioners *290 demonstrated any meaningful knowledge of nor made any independent investigation into the overall operations of the cattle industry, the risks encountered in conducting a cattle breeding business, or specifically, whether and how embryo transplant technology could be used profitably in the cattle industry. Nor did they obtain any independent financial information or background information on TCR. Ultimately, they relied almost exclusively upon the Agbanc promoters and their financial advisors, all of whom had a financial stake in having petitioners purchase their cows. Further, no attempt was made by any of the petitioners, or their agents, to negotiate the price of the cow, the terms of the lease agreement, the amount of the promissory notes, the interest rate, payment dates, or duration thereof. In fact, the offering memorandum precluded such negotiations. The absence of arm's-length negotiations is a key indicator of a transaction's lack of economic substance. Helba v. Commissioner, 87 T.C. 983, 1005-1007 (1986), affd. without published opinion 860 F.2d 1075 (3rd Cir. 1988). Nor have petitioners demonstrated that they had any reasonable *291 basis for believing their cows would generate any profits. The offering memorandum contained two calculations entitled "before tax cash flow" which projected, on an annual basis, the amount of cash the investor would receive or have to pay. These projections were made on two sets of assumptions, both of which show that the program ultimately would be profitable. Under both projections, cash flow is significantly negative in the early years. These projections turn positive in later years because they included (per cow) estimated receipts from the sale of a live calf ($ 6,000), sale of six calves, net of recipient and selling costs (at $ 5,100 each totalling $ 30,600), residual value of the cow ($ 19,500 or $ 18,000), and embryo bonus payments and embryo sales (at $ 500 each totaling $ 27,850 or $ 30,850). There is little credible evidence in this record which would substantiate the validity of those cash flow projections. Although there is some vague testimony from the principals involved in organizing, promoting, and operating the Agbanc program to the effect that the cash flow projections were prepared based on assumptions the principals deemed reasonable, their testimony was *292 not backed up by any documentary evidence of the arm's-length sales they purportedly based their assumptions on, or expert testimony validating such assumptions. Moreover, the income projections were extremely optimistic as to sales prices and the number of embryos which would be produced. For instance, the resale value of each of petitioners' cows was projected at $ 18,000 and $ 19,500; yet, there is no objective evidence in this record explaining why a cow purchased for $ 2,500 to $ 3,000 would be worth almost $ 20,000, 3, 4, or 5 years later. Moreover, a live calf was projected to command a $ 6,000 price after expenses. Again, none of the evidence explains why the offspring of a cow costing $ 2,500 to $ 3,000 would be worth more than twice as much. Consequently, petitioners have not shown that the Agbanc cows would have produced a profit given the $ 69,000 purchase price. Further, we doubt that petitioners ever believed that the Agbanc program would result in economic profit to them. None of them spent any appreciable amount of time monitoring their investments. None of them received the semi-annual production reports from TCR to which they were entitled under their lease, *293 and none of them requested this information from TCR after they failed to receive the required reports. None of the petitioners received or inquired about any accounting of the amounts which might be due to them from their cows' production, even though, according to the projections, these amounts should have been substantial. Petitioners' almost complete lack of interest confirms that they did not anticipate profits. Finally, we turn our attention to the tax benefits depicted in the offering memorandum and other promotional material. These tax benefits included deductions for depreciation, cattle maintenance, and interest expenses, as well as the investment tax credit. At the time of their investment in the Agbanc program, petitioners knew that they were investing in a program designed to yield substantial tax benefits. The offering memorandum represented that an investor purchasing one Agbanc cow would reduce his Federal income tax bill by $ 12,638 for 1983, $ 4,952 for 1984, and $ 2,835 for 1985. It was not until 1986 that the offering memorandum predicted the investor would have to pay taxes with respect to the Agbanc program, and this tax was premised on receipt of the *294 extraordinarily high prices Agbanc estimated would be received upon sale of the embryos, calves, and upon disposition of the cows. Without realization of these prices, no tax would have been incurred; in fact, additional tax losses might have been claimed. In summary, we have scrutinized the evidence and are convinced that petitioners were not seeking profits when they bought their Agbanc cows. The picture that emerges is one of petitioners who sought, bought, and claimed, substantial tax benefits through the Agbanc program. Conclusion
Based on the entire record in this case, we conclude that the Agbanc program was lacking in economic substance and business purpose and, therefore, was a "sham", and should be ignored for tax purposes. We have highlighted in the foregoing analysis those factors which were of primary importance in our coming to this conclusion: (1) Agbanc completely controlled the structure of the program; (2) petitioners had no opportunity to negotiate the price or terms of any of the elements; (3) petitioners knew practically nothing about breeding cattle and did little to enlighten themselves prior to entering into the program; (4) the cows purportedly *295 were sold to petitioners at prices 25 times their cost; (5) the cows were leased for an annual rental almost six times their value; (6) the cows were "paid" for with promissory notes the parties never expected would be collected; and (7) after investing their dollars, petitioners evidenced little interest in the profitability of their cows. Consequently, we hold that the losses and credits claimed by petitioners which are attributable to the Agbanc program are not allowable. See Falsetti v. Commissioner, 85 T.C. 332 (1985). Because of our holding, we need not consider the parties' other arguments. We note, however, that respondent failed to eliminate the lease income from Agbanc reported by the Hornes and the Bessermans when she issued their notices of deficiency. Consequently, our holding that the Agbanc transaction lacked economic substance will require a revised computation of their deficiencies because it eliminates this "income". Additions To Tax
Negligence
Respondent determined that all of the petitioners were negligent in claiming their Agbanc losses and investment credits and, therefore, that they were liable for the additions to tax under *296 sections 6653(a)(1) and (2). [6]Section 6653(a)(1) provides that, if any portion of an underpayment of tax is due to negligence or intentional disregard of rules or regulations, an amount equal to 5 percent of the underpayment is added to the tax. Section 6653(a)(2) provides for an addition to tax equal to 50 percent of the interest on the portion of the underpayment attributable to negligence. Negligence has been defined as the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances . Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), *297 affg. 79 T.C. 714 (1982); Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964); Neely v. Commissioner, 85 T.C. 934, 947 (1985). Because an addition to tax under section 6653(a) is presumptively correct, the taxpayer bears the burden of establishing that respondent's determination was erroneous.[7]Betson v. Commissioner, 802 F.2d 365, 372 (9th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1984-264; Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972); Enoch v. Commissioner, 57 T.C. 781, 802-803 (1972). *298 All of the petitioners deducted losses in connection with their Agbanc transactions. In addition, all claimed an investment credit on the cows purchased based on a $ 69,000 purchase price. In doing this, they relied on the facts and information contained in the offering memorandum and other documents submitted to them by Agbanc, and representations made to them by persons having a connection with Agbanc. None of the petitioners made any significant attempt to consult with any independent person having the type of expertise necessary to evaluate the validity of Agbanc's factual representations. None of the petitioners attempted to check with knowledgeable sources outside the Agbanc circle to independently verify the history, expertise, experience, credibility, reputation, or financial capability of Agbanc, TCR, or any of the other principals. None of the petitioners questioned, to any great degree, the genuineness of this program that promised to directly reduce their Federal income tax liability in the initial year by an amount far greater than their cash outlay during such year. We have held that the failure of a taxpayer to make a meaningful investigation beyond the promotional *299 materials supplied by the sales person was not reasonable or in keeping with a reasonably prudent person. LaVerne v. Commissioner, 94 T.C. 637, 652 (1990);    F.2d.    (9th Cir. 1992), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991). Moreover, we already have found that from petitioners' point of view the Agbanc program lacked business purpose, and was formulated to provide tax benefits. To maximize these tax benefits, petitioners signed documents which they knew, at the time, misstated the facts. For instance, they signed backdated promissory notes to "create" interest deductions for a period prior to their participation in the program, representing therein that they owed an indebtedness which they knew did not exist on July 1, 1983. In addition, other documents received by petitioners, such as the offering memorandum, should have put petitioners on notice that there were serious questions as to viability of the proffered tax benefits. Yet, before claiming these tax benefits, none of the petitioners bothered to seriously investigate whether there was any basis to the underlying facts represented *300 therein or verify whether there existed the authority necessary to support these munificent deductions and credits. Some of the petitioners testified that they consulted with their accountants about the tax benefits promised in the offering memorandum. The Courts have absolved taxpayers from additions to tax for negligence in cases where the taxpayer: (1) Consulted a fully qualified, independent, accountant; (2) fully disclosed the facts to him; and (3) then relied on his advice in good faith. See, e.g., Betson v. Commissioner, 802 F.2d at 372; Leonhart v. Commissioner, 414 F.2d 749 (4th Cir. 1969), affg. per curiam T.C. Memo. 1968-98. However, the record in this case does not adequately disclose the extent and substance of the facts petitioners disclosed to their accountants nor the essence of the advice given to them as a result. See Skeen v. Commissioner, 864 F.2d 93, 96 (9th Cir. 1989), affg. sub nom. 88 T.C. 1086 (1987). Moreover, petitioners did not call their accountant as a witness to describe the circumstances of such consultation or explain the advice given. Therefore, we may *301 properly infer that the testimony of these witnesses would have been unfavorable to petitioners' case. Pollack v. Commissioner, 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968); Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). In summary, petitioners' conduct does not evidence the due care and prudence required by the statute. Therefore, we find that petitioners were negligent, as defined by section 6653(a), and, accordingly, hold that they were liable for the additions to tax under sections 6653(a)(1) and (a)(2). Delinquency
Respondent determined that the Bessermans did not file their Federal income tax return for 1984 within the time prescribed by law and, therefore, that they were liable for the addition to tax under section 6651(a)(1). That section requires an addition to tax in case of failure to file an income tax return on time unless it is shown that such failure is due to reasonable cause and not due to willful neglect. Sec. 6651(a)(1). The burden of establishing reasonable cause rests with petitioner. Rule 142(a); BJR Corporation v. Commissioner, 67 T.C. 111, 131 (1976). *302 The record does not disclose any reason for the Bessermans not filing their return on time. Accordingly, they are subject to the addition to tax under section 6651(a)(1). Valuation Overstatements
Respondent also determined that petitioners were subject to the addition to tax under section 6659(a) for all taxable years at issue. Section 6659(a) imposes a graduated addition to tax on an underpayment "attributable to a valuation overstatement". Section 6659(c) provides that there is a valuation overstatement if the value of any property or the adjusted basis of any property claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis, as the case may be. The question of whether the addition to tax under section 6659 applies has been considered by the Fifth and Ninth Circuits (the circuits to which this case is appealable) in Todd v. Commissioner, 862 F.2d 540 (5th Cir. 1988), affg. 89 T.C. 912 (1987), and Gainer v. Commissioner, 893 F.2d 225 (9th Cir. 1990), affg. T.C. Memo. 1988-416. In Todd v. Commissioner, supra, *303 the Fifth Circuit looked to the legislative history of section 6659 to see if it provided for a method of calculating whether a given tax underpayment is attributable to a valuation overstatement. It found that: Such a formula is found * * *, in the General Explanation of the Economic Recovery Tax Act of 1981, or "blue book," prepared by the staff of the Joint Committee on Taxation. Though not technically legislative history, the Supreme Court relied on a similar blue book in construing part of the Tax Reform Act of 1969, calling the document a "compelling contemporary indication" of the intended effect of the statute. The committee staff explained section 6659's operation as follows: The portion of a tax underpayment that is attributable to a valuation overstatement will be determined after taking into account any other proper adjustments to tax liability. Thus, the underpayment resulting from a valuation overstatement will be determined by comparing the taxpayer's (1) actual tax liability (i.e., the tax liability that results from a proper valuation and which takes into account any proper adjustments) with (2) actual tax liability as reduced by taking into account *304 the valuation overstatement. The difference between these two amounts will be the underpayment that is attributable to the valuation overstatement. [Todd v. Commissioner, 862 F.2d at 542-543, fn. refs. omitted.]
Subsequently, in Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, supplemental opinion T.C. Memo. 1991-189, the Fifth Circuit, using the formula approach, arrived at the same conclusion when all of the deductions and credits related to the tax shelter had been disallowed by respondent, and the taxpayer conceded the disallowance prior to trial. The court explained: Whenever the I.R.S. totally disallows a deduction or credit, the I.R.S. may not penalize the taxpayer for a valuation overstatement included in that deduction or credit. In such a case, the underpayment is not attributable to a valuation overstatement. Instead, it is attributable to claiming an improper deduction or credit. In this case, the Heasleys' actual tax liability does not differ one cent from their tax liability with the valuation overstatement included. In other words, the Heasley's valuation *305 overstatement does not change the amount of tax actually owed. * * * [Heasley v. Commissioner, 902 F.2d at 383]
In considering a particular issue, this Court is constrained to follow the reasoning of the Court of Appeals to which appeal would lie. Coastal Petroleum Refiners, Inc. v. Commissioner, 94 T.C. 685, 687 (1990); Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971). Pursuant to Todd, Heasley, and Gainer, we hold that the addition to tax under section 6659 does not apply in these cases. Substantial Understatement
Respondent also determined that, to the extent that section 6659 does not apply, petitioners are liable for the addition to tax under section 6661. That section applies to income tax returns that are due to be filed after December 31, 1982, if the addition to tax will be assessed after October 21, 1986. All of the income tax returns under consideration were filed after December 31, 1982, and any assessment of this addition to tax will be made after this Court renders its decision. Therefore, section 6661 is applicable to all *306 years at issue. Section 6661 provides that a taxpayer whose income tax return contains a substantial understatement of tax may be liable for an addition to tax equal to 25 percent of the underpayment attributable to such understatement. Pallottini v. Commissioner, 90 T.C. 498 (1988). The term "understatement" is expressly defined by section 6661(b)(2) as the excess of the amount of the tax required to be shown on the return over the amount of the tax which is actually shown on the return filed. Further, the term "substantial understatement" is defined in section 6661(b)(1) as an "understatement" which exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. If a "substantial understatement" is present, it triggers the application of the addition to tax provided for in section 6661(a). Woods v. Commissioner, 91 T.C. 88, 95 (1988). In her brief, respondent conceded that if this Court finds that there is no economic substance or business purpose to the Agbanc transaction, the elimination of Agbanc income from the tax computation will decrease the Rasmussens' and Hornes' deficiencies for 1984 to an amount *307 less than $ 5,000. Since we have found that the Agbanc program lacked economic substance, it follows then that the Rasmussens and the Hornes are not subject to the addition to tax under section 6661 for 1984. Moreover, respondent determined that the section 6661 addition to tax does not apply to the Bessermans for 1984 and 1985 because their deficiencies for those years are less than $ 5,000. Consequently, the $ 5,000 threshold amount eliminates the issue of the section 6661 addition to tax, except with regard to all petitioners for 1983 and the Hornes for 1984. Further, the amount of the understatement taken into account under section 6661 can be reduced if there is substantial authority for the tax treatment of the item at issue. Sec. 6661(b)(2(B)(i). In the case of "tax shelters", the reduction for substantial authority applies only where the taxpayer reasonably believed that the tax treatment was more likely than not the proper treatment. Sec. 6661(b)(2)(C). A partnership, other entity, investment plan, or other arrangement, whose principal purpose is the avoidance or evasion of Federal income tax is considered a "tax shelter" for section 6661 purposes. Sec. 6661(b)(2)(C)(ii); *308 sec. 1.6661-5(b)(1), Income Tax Regs.
As noted earlier, petitioners did not address the additions to tax in their brief. Therefore, they have not argued that their position is supported by substantial authority. Moreover, we know of no such authority inasmuch as we have held that petitioners' participation in the Agbanc program was motivated by the tax benefits offered thereby. Further, we find that petitioners did not believe that the tax treatment they reported on their return was more likely than not the proper treatment. This finding is evidenced most succinctly by the facts surrounding the investment credits claimed by petitioners. These credits were based on purchase prices inflated by notes which were to be largely "paid" by offsetting credits through Agbanc. We are convinced that petitioners understood that the basis on which the investment credit was claimed could have been set by Agbanc at any amount just as long as offsetting lease payments were raised proportionately. Moreover, although petitioners testified at trial that they believed they ultimately would make a profit in the Agbanc program, and that, therefore, it was a bona fide business activity, their actions *309 belie their statements. There is no evidence that any of them followed up their investment to ascertain whether it was or could be profitable. None of them knew whether their cow was producing embryos and, if so, the value of the production. The Hornes did not even know that their cow had died until some months later. The only aspect of the program petitioners continued to follow was the viability of the tax benefits. We believe that they were nervous about the claimed benefits because the discussion of the tax aspects of the program in the offering memorandum indicated they may not be upheld under close scrutiny. Horn v. Commissioner, 90 T.C. 908, 942-944 (1988). Consequently, we find that petitioners did not reasonably believe that the treatment of those items in their tax returns would prevail. For this reason and the others stated heretofore, we hold that petitioners are subject to the additions to tax under section 6661 for the applicable years. Increased Interest
Respondent also determined that all of the petitioners were subject to the increased rate of interest provided in section 6621(c). [8]Section 6621(c) provides for an interest rate *310 of 120 percent of the adjusted rate established under section 6621(b) if there is a "substantial underpayment" which is "attributable to 1 or more tax motivated transactions". Stanley Works & Subsidiaries v. Commissioner, 87 T.C. 389, 413-415 (1986). An underpayment is substantial if it exceeds $ 1,000. Sec. 6621(c)(2). The increased rate applies to interest accrued after December 31, 1984, even though the transaction was entered into prior to the date of enactment of section 6621(c). Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). The phrase "tax motivated *311 transaction" includes sham transactions entered into for tax benefits. Sec. 6621(c)(3)(A)(v); Sheldon v. Commissioner, 94 T.C. 738, 770 (1990); Patin v. Commissioner, 88 T.C. 1086 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. without published opinion sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). We have found that the Agbanc program lacked business purpose and economic substance and that petitioners entered into such program to obtain its tax benefits. It is therefore a "sham" transaction. McCrary v. Commissioner, 92 T.C. 827, 852-854 (1989). Because sham transactions are tax motivated transactions which fall within the scope of section 6621(c)(3)(A)(v), we hold that petitioners are liable for the increased interest. Based on the foregoing, Decisions will *312 be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Donald B. Horne and Marjorie S. Horne, docket No. 27744-87, and Richard Besserman and Rosalie Besserman, docket No. 27736-88.↩
2. All section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. 50 percent of the interest due on the deficiency. ↩
2. Applies to that portion of the deficiency to which section 6659↩ is not applicable. 3. To be determined.↩
1. 50 percent of the interest due on the deficiency. ↩
2. Applies to that portion of the deficiency to which section 6659↩ is not applicable. 3. To be determined.↩
3. "Purebreds" are Simmental cattle upgraded from other breeds to reflect at least 7/8ths Simmental for cows and 15/16ths Simmental for bulls. "Fullbloods" have 100% Simmental (European) parentage.↩
1. For the year ending December 31, 1984, Agbanc projected that the investor would receive rental income of $ 14,070, make a note payment of $ 17,685 and two maintenance payments totalling $ 2,627. This resulted in a negative cash flow of $ 6,242 ($ 17,685 + 2,627 - 14,070). ↩
2. For the year ending December 31, 1986, the calculation was as follows: ↩
Description
Option A
Option B
Lease
$ 14,070 $ 14,070 (6) calves sold at 2,000 12,000 (4) embryos sold at 500 2,000 2,000 Less: Debt Service    (17,685)
(17,685)
Operating Expenses      (2,252)
(5,852)
Cash Flow      $ 8,133  ($ 7,467) 3. For the year ending December 31, 1987, the calculation was as follows: ↩
Description
Option A
Option B
Bonus Payment
$ 23,850 $ 23,850 Cow sold (Residual value)
19,500
(6) calves sold at 5,100 30,600 (4) embryos sold at 500 2,000 (7) embryos sold at 500 3,500 Less: Debt Service    (26,383)
(26,383)
Operating Expenses      (1,126)
(2,702)
Cash Flow      $ 17,481 $ 28,865 4. For the year ending December 31, 1988, Agbanc projected that the cow would be sold for $ 18,000, three embryos would be sold at 500 each for $ 1,500 and maintenance would cost $ 1,126. This resulted in cash flow of $ 18,374 ($ 18,000 + $ 1,500 - $ 1,126).↩
4. Secs. 38(a)(2) and 46(a) allow an investment tax credit based on a percentage of the cost of a "qualified investment". Under sec. 46(c), a "qualified investment" could only be in "sec. 38 property". Sec. 48(a) limits "sec. 38↩ property" to certain tangible property. Therefore, the investment tax credit is available only on tangible property. 5. The availability of accumulated cost recovery system depreciation under sec. 168 is also linked to tangible property. Sec. 168 provides for depreciation on "recovery" property. Sec. 168(c) defines "recovery" property as "tangible property". Thus, the depreciation deduction under section 168↩ is available only on the cost of tangible property.
6. The additions to tax for negligence (sec. 6653(a)), valuation overstatements (sec. 6659), and substantial understatement of tax liability (sec. 6661↩), were repealed for income tax returns due to be filed after December 31, 1989, and were replaced with an accuracy related addition under sec. 6662. Omnibus Budget Reconciliation Act of 1989, Pub . L. 101-239, sec. 7721(c), 103 Stat. 2106, 2395.
7. Despite their burden to prove that the additions to tax determined by respondent were wrong, petitioners failed to address the correctness of such determinations in either their opening or reply briefs. Therefore, we could construe that these issues were conceded by petitioners. Harris v. Plastics Manufacturing Co., 617 F.2d 438 (5th Cir. 1980); see also Stringer v. Commissioner, 84 T.C. 693, 708 (1985), affd. without published opinion 789 F.2d 917↩ (4th Cir. 1986). However, because the additions to tax were challenged in the petitions and are a substantial part of respondent's determinations, we will address their correctness.
8. Prior to the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1511(a), 100 Stat. 2085, 2744, subsection (c) was designated subsection (d). Sec. 6621(c)↩ was repealed as to income tax returns due to be filed after December 31, 1989, by sec. 7721(b) of the Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, 103 Stat. 2106, 2399.